IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| IN RE: JUSTIN EISENHART and<br>BRITTANY EISENHART,<br>Debtors | CASE NO. 5:20-bk-71965-R<br>Chapter 7 |
| IN RE: ERIC SOLLER | CASE NO. 5:21-mp-00702-R |

**UNITED STATES TRUSTEE'S RESPONSE IN OPPOSITION TO AMENDED AND RESTATED MOTION PURSUANT TO LOCAL RULE 2090-1(b) FOR *PRO HAC VICE* ADMISSION OF DANIEL E. GARRISON, ESQ., OR, IN THE ALTERNATIVE, MOTION TO DISQUALIFY DANIEL E. GARRISON FROM ACTING AS COUNSEL IN THIS MATTER**

Comes now Daniel J. Casamatta, Acting United States Trustee for Region 13 (the "UST"), by and through undersigned counsel, pursuant to 11 U.S.C. § 307, and states the following for his response in opposition to *pro hac vice* admission of Daniel E. Garrison, Esq., or, in the alternative, his motion to disqualify Daniel E. Garrison from acting as counsel in this matter:

### I. JURISDICTION

1. This Court has jurisdiction of this matter under 28 U.S.C. §§ 1334(a) and (b), 28 U.S.C. §§ 157(a) and (b)(1), and 28 U.S.C. § 151.

### II. INTRODUCTION

2. Arkansas attorney Eric Soller is currently a defendant/respondent in two upcoming proceedings before this court. First is the Court's Order to Appear and Explain and Produce in the matter of *Eric Soller*, Case No. 5:21-mp-00702 (the "MP"), and the second is the UST's Motion to Examine Debtor's Transactions with Attorney (Doc. #22) (the "UST Motion") in *In re Justin Eisenhart and Brittany Eisenhart*, Case No. 5:20-bk-71965 (the "Eisenhart Case").

3. Mr. Soller has elected to retain Daniel E. Garrison, an attorney licensed to practice in Arizona, as his counsel for both matters. Mr. Soller now moves this Court to admit Mr. Garrison as his counsel *pro hac vice*. The UST objects to Mr. Garrison's *pro hac vice* admission under these specific factual circumstances. Mr. Garrison should not be permitted to participate in the Eisenhart case and the MP under Local Rule 2090-1 due to his conflict of interest in this matter. In the alternative, the UST asserts that Mr. Garrison should be disqualified from representing Mr. Soller in these matters based on his conflict of interest in violation of the Arkansas Rules of Professional Conduct.

### III. FACTS

4. The UST first became aware that Mr. Soller was working with Fresh Start Funding, LLC ("FSF") around December 2020. On or about December 29, 2020, the UST sent an email to Mr. Soller requesting documents pertaining to his relationship with FSF and his representation of Jessica and Sabrina Torres-Truelove, debtors in one of the MP cases. Mr. Soller responded that he would work to get the information to the UST.

5. On January 12, 2021, the UST received an email from info@protegolaw.com. The email, which was comprised of multiple document attachments, included a five-page letter from Protego Law ("Protego") that was signed by Mr. Garrison. A copy of the letter is attached to this response and is referred to here as **UST Exhibit 1**.

6. In the letter, Mr. Garrison stated that Protego was representing Mr. Soller "in connection with [the UST's] email inquiry." Mr. Garrison goes on to state: "[m]y firm provides legal work in connection with a defense guaranty offered by Fresh Start Funding" and that Mr. Garrison's two purposes in writing were "to provide [the UST] with the information [the UST] requested from Mr. Soller" and to provide "additional background information about bifurcation

3

and '$-down' bankruptcy, Fresh Start Funding's business and its relationship with Mr. Soller and his firm." UST Ex. 1.

7. Upon information and belief, based on facts learned and fully developed in the past few months, Mr. Garrison's relationship to FSF is far more direct and entangled than set forth in the January 12, 2021 letter.

8. Mr. Garrison, according to the description he produced, is a "co-founder and Managing Director" for FSF, the third-party financing entity that provided Mr. Soller contracts, training, and collection capacity in connection with his bifurcated fee agreements with clients. Fresh Start funding is based in Scottsdale, Arizona and operates out of what appears to be an office building at 1805 N. Scottsdale Rd., Suite 100, Scottsdale, AZ, 85281.

9. Mr. Garrison is also the "co-founder and lead litigation counsel" at Protego, his law firm that is also based out of Arizona and that "represent[s] chapter 7 attorneys who offer post-petition payment terms to their clients."[1] According to their website, Protego has the same physical address as FSF: 1805 N. Scottsdale Rd., Suite 100, Scottsdale, AZ, 85281.

10. As a managing member of FSF, Mr. Garrison has fiduciary duties of loyalty and care to act in good faith and promote the interests of FSF.

11. Upon information and belief, Mr. Garrison is one of two managing members of FSF; the other is Matthew R. Hartley. Mr. Hartley is also a co-founder of Protego and is the only other attorney listed on Protego's website. Indeed, Protego seems to consist entirely of Mr. Garrison and Mr. Hartley.[2]

12. In another matter involving the UST, now pending in the United States Bankruptcy Court for the Western District of Missouri, Mr. Garrison signed a stipulation of fact in which he

---

[1] https://www.protegolaw.com/ (last accessed Sept. 3, 2021).
[2] *See id.*

4

admitted that he and Mr. Hartley indirectly own, through other entities, a majority of the membership interests in FSF. *In re Rosema*, Case No. 20-40366-can7, ECF Doc. No. 98-1 at para 29 (Bankr. W.D. Mo. July 14, 2020).

13. One document provided by Mr. Garrison in connection with the UST inquiry of Mr. Soller is a "Line of Credit and Accounts Receivable Management Agreement" (the "AR Agreement") between Mr. Soller, Eric Soller Attorney at Law (Mr. Soller's law firm), and FSF. A copy of the AR Agreement is attached to this motion and incorporated by reference herein as **UST Exhibit 2**.

14. In general, the AR Agreement provides that FSF will extend a line of credit to Mr. Soller, based on a case-by-case review of fees due to Mr. Soller from his clients. UST Ex. 2, ¶ 2. Under the AR Agreement, FSF is entitled to a fixed 25% fee, calculated based on the specific amount of each client's financed fee arrangement, regardless of whether the fees are ever collected from the client. UST Ex. 2, ¶¶ 2-2.1 and 5.9. Upon satisfactory proof of meeting certain "underwriting" conditions set by FSF for each case, which allegedly include a minimum client income level, and Mr. Soller's use of certain FSF-approved engagement agreements, FSF would advance a percentage of the fees set forth in the agreement to Mr. Soller shortly after the filing of the bankruptcy case. UST Ex. 2, ¶ 2.1. Some amount of the fees that may ultimately be due to Mr. Soller are retained in a "hold back account", subject to a formula set forth in the AR Agreement. UST Ex. 2, ¶ 2.2. If the client fails to pay, FSF is entitled to withdraw the amount of the missed payment, which may include FSF's fee, from the hold back account. *Id.*

15. In addition to the hold back account, under the AR Agreement, FSF holds certain legal interests in Mr. Soller's fees in this case. For example, Mr. Soller pledged the fees themselves as collateral to FSF. UST Ex. 2, ¶¶ 2.5, 8.5. Further, Mr. Soller assigned all management and collection of the fees to FSF. UST Ex. 2, ¶¶ 5.3-5.4. In exchange for entering into the AR

Agreement, FSF has agreed to provide a defense guarantee to Mr. Soller regarding any challenge "by the US Trustee or a Bankruptcy Judge with regard to the legality or ethical propriety of chapter 7 bifurcation." UST Ex. 2, ¶ 6.4. Further, the AR Agreement states that "[i]f a final non-appealable order is issued holding that bifurcation of Chapter 7 cases is not allowed under the Bankruptcy Code, FSF will indemnify [Soller], in accordance with the Defense Policy against disgorgement of fees in an amount not to exceed $50,000." *Id.*

16. The AR Agreement incorporates by reference FSF's Defense Guaranty and Indemnity Policy ("the Indemnity Agreement") for attorneys using their services. A copy of the Indemnity Agreement is attached to this motion and referenced herein as **UST Exhibit 3**. The Indemnity Agreement states:

> Our Promise to You
>
> If you follow the best practices set out above (and we'll provide you all of the training and forms to make that easy), and you're challenged in court by a panel trustee, the United States Trustee or a judge, *we'll defend you and indemnify you if we are unsuccessful*. What does that mean? Here's what we'll do:
>
> 1. We'll represent you with one of our in-house attorneys or, if needed, outside counsel.
> 2. We'll draft all necessary briefs using our extensive research and analysis on bifurcation, the bankruptcy code and rules, and the rules of professional responsibility.
> 3. We'll provide counsel to conduct oral argument on any motion.
> 4. We'll also represent you on any appeal of an adverse decision.
> 5. If a non-appealable order is issued holding that bifurcation of Chapter 7 cases is not allowed under the Bankruptcy Code, we'll indemnify you against disgorgement for up to $50,000.00.*[3]

UST Ex. 3.

17. The AR Agreement was signed by Mr. Soller as representative of his firm and by Mr. Hartley, who is co-counsel to Mr. Garrison at Protego, as representative of FSF.

---

[3] The asterisk directs the reader to a footnote in small print that says: "Terms and conditions apply."

18. Recently, the UST took a Rule 30(b)(6) deposition of Mr. Hartley as a corporate representative of FSF in connection with pending litigation in the Western District of Missouri (the "Hartley Deposition"). A copy of the Hartley Deposition is attached to this motion and incorporated herein as **UST Exhibit 4**. During the Hartley Deposition, Mr. Hartley admitted the following as it pertains to FSF: (1) that FSF drafts and controls key components of the fee/engagement agreements used by the attorney with the Debtors (UST Ex. 4, p. 45); (2) that Mr. Garrison and Mr. Hartley were personally involved in drafting the language to be used in the agreements (UST Ex. 4, pp. 49-50); and, (3) that FSF's fee is determined as a straight percentage of the post-petition fee charged in the case (UST Ex. 4, p. 141).

19. In response to a subpoena issued in the WDMO litigation, FSF produced a copy of video presentations (one of which includes Mr. Garrison personally), which were distributed to FSF's customers and potential customers, specifically encouraging attorneys financing fees through FSF to raise their post-petition rates and to charge the maximum allowed in a district.

20. On July 15, 2021, the UST Motion was filed in the Eisenhart Case. The UST Motion asks this Court to examine the fees paid by the Eisenharts to Mr. Soller and to determine whether they were excessive based upon the services Mr. Soller performed.

21. On July 29, 2021, this Court issued the MP ordering Mr. Soller to appear and explain his fees in the Eisenhart case and in three other FSF cases, amongst other concerns.

22. On July 30, 2021, Mr. Garrison emailed the UST stating that he would be representing Mr. Soller in the MP and in the Eisenhart Case.[4]

23. The UST initially raised concerns about Mr. Garrison's representation of Mr. Soller *pro hac vice* because Mr. Garrison indicated that Mr. Soller would act as Mr. Garrison's local

---

[4] The email also articulated that Mr. Garrison was now representing another Arkansas attorney, Jack Burns, who is also using FSF's services.

7

counsel under Local Rule 2090-1. The UST was concerned about its ability to contact Mr. Soller as local counsel because he is also a represented party, which the UST is typically prohibited from contacting.[5] Mr. Garrison acknowledged this concern and stated that he would provide the UST with written consent to contact Mr. Soller. No consent has yet been provided.

24. On August 16, 2021, Mr. Soller, with Mr. Garrison's attestation, filed his first Motion Pursuant to Local Rule 2090-1(b) for Mr. Garrison's *Pro Hac Vice* Admission in the MP (the "First *Pro Hac* Motion") (Doc. #9 in the MP).[6]

25. On August 17, 2021, Mr. Soller, with Mr. Garrison's attestation, filed an Amended and Restated Motion for Mr. Garrison's *Pro Hac Vice* Admission (the "Amended *Pro Hac* Motion") (Doc. #25 in the Eisenhart case; Doc. #12 in the MP). It appears from the Amended *Pro Hac* Motion that Mr. Garrison no longer intends to provide the UST with consent to contact Mr. Soller as local counsel; rather he has chosen to request waiver of the local counsel requirement. If granted, all contact with Mr. Soller must be made through Mr. Garrison.

26. Also on August 17, 2021, Mr. Soller filed a Combined Response to the UST Motion and the Court's Order in the MP (the "Combined Response") (Doc. #10). Many of the arguments and case law citations set forth in the Combined Response mirror those found in Protego's letter to the UST.

### IV. ARGUMENT

27. Mr. Garrison seeks to be admitted to practice before this Court *pro hac vice* for the

---

[5] Under the McDade Act, (also known as the Citizen Protection Act), codified in 1998 at 28 U.S.C. § 530B, DOJ attorneys "shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B. The McDade Act is often cited for the proposition that the UST must follow state bar rules concerning attorney-client "no contact" rules in federal investigations.

[6] Upon information and belief, the original *pro hac vice* motion was inadvertently not filed in the Eisenhart Case.

MP and the Eisenhart case. Thus, Mr. Garrison must submit to the standards of professional conduct for this Court which are governed by the Arkansas Rules of Professional Conduct and Federal Rule of Bankruptcy Procedure 9011. Local Rule 2090-2 (adopted Jan. 12, 2006). Local Rule 2090-1 governs admission to practice before this court and provides that attorneys from other states "may be admitted to this Court *pro hac vice* upon a proper showing of qualifications to participate in a particular case or proceeding before this Court." Local Rule 2090-1 (rev. Jan. 12, 2006).

28. Local Rule 2090-1 has no committee notes and does not provide guidance on what this Court should consider in determining an attorney's "proper showing of qualifications." However, the Arkansas Supreme Court's Rules Governing Admission to the Bar ("Bar Rules") provide persuasive authority from which this Court can draw corollary guidance for *pro hac vice* admission.

29. Arkansas Bar Rule 14 governs *pro hac vice* appearances by non-resident attorneys and articulates the requirements for participation in Arkansas proceedings. It states in pertinent part as follows:

> (e) The court may examine the non-resident attorney to determine that the non-resident attorney is aware of and will observe the ethical standards required of attorneys licensed in Arkansas. If the court determines that the non-resident attorney is not a reputable attorney who will observe the ethical standards required of Arkansas attorneys, that the non-resident attorney has been engaging in the unauthorized practice of law in the state of Arkansas, or that other good cause exists, the court may deny the motion.

Ark. R. Gov'g Admis. Bar XIV(e).

30. Because Arkansas courts can examine an attorney's awareness of and compliance with the ethical standards before granting *pro hac vice* admission, it is appropriate for this court to undertake the same analysis. Based on the following ethics analysis, the UST avers that Mr. Garrison's representation of Mr. Soller is incompatible with the Arkansas Rules of Professional

9

Conduct, therefore he should not be deemed qualified to be admitted to practice before this Court *pro hac vice*.

### A. Mr. Garrison Holds a Concurrent Conflict of Interest Under Rule 1.7 Which Impairs the Adversary System, and It is Not Reasonable to Believe That He Can Provide Proper Representation.

31. Rule 1.7 of the Arkansas Rules of Professional Conduct states that:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. **A concurrent conflict of interest exists if:**
> (1) the representation of one client will be directly adverse to another clients; or
> (2) **there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to** another client, a former client or **a third person or by a personal interest of the lawyer**,

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
> (1) the lawyer **reasonably** believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> (2) the representation is not prohibited by law:
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> (4) each affected client gives informed consent, confirmed in writing,

ARK. RULES PROF'L. CONDUCT R. 1.7 (emphasis added). The official comments go on to state that lawyers must consider how their representation of a client may be otherwise materially limited, such as by the lawyer's fiduciary responsibilities as a trustee, executor, or corporate director. *Id*., at cmt. 9.

32. Within the Rule 1.7 framework, Mr. Garrison has both a responsibility to a third party, FSF, and a personal interest. Mr. Garrison is a managing member of FSF and thus has fiduciary duties of loyalty and care to act in good faith and promote the interests of FSF. Mr. Garrison also has a personal interest in the success of FSF as an owner of the company. These duties constitute a concurrent conflict of interest because Mr. Garrison has a duty to protect FSF,

10

an entity he partially owns, directly controls, and profits from, and that duty materially limits his ability to independently represent Mr. Soller.

33. For example, it may be in Mr. Soller's interest as a client to defend himself in the MP or the Eisenhart case by arguing that FSF was somehow to blame for any issues or untoward conduct. But Mr. Garrison has a vested interest in not bringing that argument to the court because he is both an owner and fiduciary of FSF, which could be materially harmed by such statements. Similarly, if Mr. Soller wanted to settle these issues by agreeing not to participate with FSF, Mr. Garrison's responsibility to FSF would be impermissibly entangled in that conversation. Mr. Soller's interests (and thereby Mr. Garrison's interests as his counsel) are not aligned with Mr. Garrison's ownership interest and fiduciary duties to FSF. This is precisely what the ethics rules are designed to address. In that circumstance, an attorney's materially limited representation would and should result in her non-representation of the client.

34. Concurrent conflicts of interest can also arise where a third party pays for an attorney's services. The comments to Rule 1.7 state that:

> [13] A lawyer may be paid from a source other than the client, including a co-client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or independent judgment to the client. See Rule 1.8(f). For example, when an insurer and its insured have conflicting interests in a matter arising from a liability insurance agreement, and the insurer is required to provide special counsel for the insured, the arrangement should assure the special counsel's professional independence.

*Id.*, at cmt. 13.

35. The relationship between FSF and Mr. Soller under the Indemnity Agreement could be compared to that of an insurance company and its insured. Thus, to comply with Rule 1.7, FSF and Mr. Soller's arrangement would require FSF to hire outside counsel to "assure the special counsel's professional independence." *Id*.

36. Unfortunately, FSF has not secured counsel for Mr. Soller that assures

11

independence. Instead of outside counsel, FSF hired its own co-founder, Mr. Garrison, through what Mr. Garrison calls "my firm," Protego, which is comprised of the same two lawyers who act as managing directors for FSF: Mr. Garrison and Mr. Hartley. Both FSF and Protego operate out of the same office. This enables FSF to effectively control the litigation even if this is prejudicial to the client's interests.

37.     In summary, Mr. Garrison, through his ownership and contributions to FSF, contracted with Mr. Soller, set out the terms of the fee agreements, and agreed to indemnify Mr. Soller if he was questioned about his fee practices in connection with FSF. Now that those practices are in question, Mr. Garrison is asking this Court to allow him to personally represent Mr. Soller. And somehow Mr. Garrison's conflict as on owner of FSF with Mr. Soller is alleviated by labeling Protego as purportedly "independent counsel," even though Protego consists entirely of Mr. Garrison and Mr. Hartley and is effectively an affiliate of FSF. Absolutely nothing about this situation indicates that Mr. Garrison, FSF, or Protego have taken steps to assure their "professional independence."

38.     Finally, while Mr. Garrison's Rule 1.7 conflicts could be waivable by Mr. Soller, FSF and Mr. Soller have not yet presented their signed waivers to the court. Moreover, such waivers would be ineffective because the Arkansas Rules explicitly state that such a waiver is effective only if the representation is "reasonabl[e]." ARK. RULES PROF'L. CONDUCT R. 1.7(b)(1). At least one circuit has long held that disqualification may nevertheless be appropriate "to preserve the integrity of the adversary process . . .where an attorney's conflict of interest . . . undermines the confidence in the vigor of the attorney's representation of his client." *Board of Ed. of City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2nd Cir. 1979); *see also Williams v. Trans World Airlines, Inc.*, 588 F.Supp. 1037, 1042-43 (W.D. Mo. 1984) (quoting cases for the propositions that both the public trust and the ethical administration of justice are important considerations in

reviewing whether counsel should be disqualified). In this case, the mere fact of having Mr. Garrison as his attorney will effectively prevent Mr. Soller from obtaining legal advice as to whether it is in his best interest to separate his interests from those of FSF. Moreover, it is difficult to see how there would be any cognizable harm to a party before this Court if Mr. Garrison were disqualified. FSF would still be contractually obligated to provide counsel to Mr. Soller – but it would be held to its obligation to provide *conflict-free* representation. Thus, the integrity of the bankruptcy process compels a closer look at the propriety of Mr. Garrison's representation.

39. Here, this conflict will manifest itself in the proceedings, as it has in ongoing proceedings in other districts. For example, as previously discussed, the UST is involved in ongoing litigation related to similar issues in the Western District of Missouri. Mr. Garrison has appeared as counsel in that matter. During the course of the litigation, it became necessary for the UST to subpoena documents held by FSF relevant to the ongoing litigation and to take a deposition of FSF pursuant to Fed. R. Civ. P. 30(b)(6), made applicable to those proceedings by Fed. R. Bankr. P. 9014(c) and Fed. R. Bankr. P. 7030. In response to the subpoena, Mr. Garrison raised certain procedural and substantive objections to the UST, which clearly were raised on behalf of FSF and not his attorney client. Further, at the Rule 30(b)(6) deposition, FSF proffered Mr. Hartley as its corporate representative, which is extremely problematic since Mr. Hartley and Mr. Garrison are affiliated together with Protego Law.

40. Additionally, after the UST raised questions about FSF's conduct, Mr. Garrison has counseled his attorney clients to file declaratory judgment actions against the UST to seek judicial approval of FSF's business model in the Western District of Missouri. *See Bearden Law v. Casamatta*, Adv. Case No. 20-4032, ECF Doc. No. 1 (Bankr. W.D. Mo. May 5, 2020); *Jennifer Benedict Law Office, LLC v. Casamatta*, Adv. Case No. 20-4027, ECF Doc. No. 2 (Bankr. W.D. Mo. May 4, 2020). These actions were filed to benefit and "bless" FSF's business practices, a fact

that was quite clear to the Bankruptcy Court, who subsequently entered orders to show cause why the cases should not be dismissed for numerous reasons, including lack of standing, lack of subject matter jurisdiction and failure to state a claim. *See Bearden Law*, ECF Doc. No. 16 at 6-9; *Jennifer Benedict Law Office*, ECF Doc. No. 19 at 6-9. Subsequently, the actions were voluntarily dismissed in response to the orders to show cause.[7]

41. It is the UST's experience that Mr. Garrison is seeking to wear multiple hats at the same time – to defend FSF's business interests, and to fulfill the defense guarantee set forth in the AR Agreement. Permitting Mr. Garrison to advance his own personal interest while acting as counsel in this matter is neither reasonable nor consistent with the adversary process or the administration of justice.

### B. Mr. Garrison, Protego, and/or FSF Are Funding Mr. Soller's Litigation Expenses in Derogation of Rule 1.8(e).

42. Under the Arkansas Rule of Professional Conduct, a lawyer shall not:

> (e) provide financial assistance to a client in connection with pending or contemplated litigation, except that: (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and (2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

ARK. RULES PROF'L. CONDUCT R. 1.8. Notably, this rule may not be waived by the client. The official comments explain that this prohibition is necessary because allowing a lawyer to pay for the costs of lawsuits "would encourage clients to pursue lawsuits that might not otherwise be brought and because such assistance gives lawyers too great a financial stake in the litigation."

---

[7] Earlier, when it was unclear whether the UST or a court would raise ethical questions regarding FSF's practices, FSF appears to have taken the opposite tactic of discouraging its customers from raising the issue proactively to obtain a ruling by the court. Thus, in the Missouri litigation, FSF suggested that an attorney's failure to meet her obligation to file an application for Court approval of her fee agreement was the result of a "tactical decision" (apparently made by FSF and agreed to by the attorney) because such an application was inconsistent with FSF's business model. *See* Transcript of Status Hearing (July 21, 2020) at 22-23, *In re Rosema*, No. 20-40366-can7), a copy of which is attached to this motion and referred to herein as **UST Exhibit 5**.

14

*Id.*, at cmt. 10.

43. Here, Mr. Garrison owns an interest in FSF, which, in turn, is indemnifying Mr. Soller. Accordingly, Mr. Garrison is financing this litigation, because he is on the hook, so to speak, for the judgment. Therefore, it is highly improper for Mr. Soller's counsel to be a principal in the very entity that will pay any judgment. An attorney cannot indemnify his own client from a potential judgment. *See Fla. Bar v. Patrick*, 67 So.3d 1009, 1014-15 (Fla. 2011) (lawyer suspended for violating Rule 1.8(e) when he orally agreed to indemnify his client against any potential award of the opposing attorneys' fees and costs, and then paid for his client's attorney fees charged by another firm in appealing that adverse judgment); *Computer Dynamics Inc. v. Merrill (In re Computer Dynamics Inc.)*, 252 B.R. 50, 63-64 (Bankr. E.D. Va. 1997).

44. Mr. Garrison may argue against the application of this rule because Mr. Soller's Indemnity Agreement is with FSF rather than with Protego or Mr. Garrison. Given the complete identity of ownership and personnel, however, FSF and the Law Firm are effectively the same entity for purposes of a conflicts analysis. Moreover, the idea that FSF is actually paying the Law Firm for its services in representing Mr. Soller is inherently suspect, considering that the same people, Mr. Hartley and Mr. Garrison, are on both sides of the agreement. The UST contends that because Mr. Garrison is both the lawyer for the Law Firm *and* a director and owner of FSF, it is doubtful that FSF paid for Mr. Soller's litigation financing assistance. And even if it did, it would amount to Mr. Garrison and Mr. Hartley effectively paying themselves.

### C. Mr. Garrison Holds A Proprietary Interest In The Outcome Of The MP and The Eisenhart Case In Derogation Of Rule 1.8(i).

45. Rule 1.8(i) states that:

[a] lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may: (1) acquire a lien granted by law to secure the lawyer's fee or expenses; and (2) contract with a client for a reasonable contingent fee in a civil case.

15

ARK. RULES PROF'L. CONDUCT R. 1.8(i). Here, too, this rule may not be waived by the client. As the official comments note, "when the lawyer acquires an ownership interest in the subject of the representation, it will be more difficult for a client to discharge the lawyer if the client so desires." *Id*., at cmt. 16.

46. This rule is identical to the American Bar Association Model Rule in this regard and has been almost universally adopted. *See* MODEL RULES PROF'L. CONDUCT R. 1.8(i). Courts finding that a lawyer has acquired a prohibited interest in the subject matter of the litigation have found that disqualification is appropriate unless the interest can be divested prior to trial. *See, e.g. Sauer v. Xerox Corp.*, 85 F.Supp.2d 198, 201 (W.D.N.Y. 2000) (attorney required to divest himself of interest because "[i]f [the attorney] believes he is the one-third owner of the equipment . . . it is that subjective belief that could affect his judgment in pursuing the action and in defending against . . . counterclaims.").

47. Mr. Garrison, through a wholly-owned limited liability company, is a member and apparent one-third owner of FSF – an interest which Mr. Garrison has acknowledged in open court. FSF has a contractual interest not only in the collection of Mr. Soller's fees, but also directly in whether Mr. Soller is successful in the litigation because FSF has agreed to indemnify Mr. Soller up to $50,000 for any disgorgement which may be ordered. If anything, FSF, and by extension Mr. Garrison, has a greater interest in the matter than Mr. Soller (although this is not required to show a violation of Rule 1.8(i)). Thus, because Mr. Garrison has a personal financial interest in FSF, and FSF has a direct financial interest in the outcome of the litigation, Mr. Garrison's representation of Mr. Soller is specifically prohibited by the relevant rules of professional conduct.

### D. In the Alternative, Mr. Garrison Should Be Disqualified From Serving As Counsel In These Matters.

48.　If the Court finds that the above-articulated conflicts do not go to the analysis of Mr. Garrison's "qualifications" for admission *pro hac vice*, the UST alternatively moves this court to disqualify Mr. Garrison from serving as counsel in these matters under the Arkansas Rules of Professional Conduct.

49.　Decisions to disqualify an attorney in federal litigation are vested in the sound discretion of the trial court. *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1154 (8th Cir. 1999). Such motions are subject to "particularly strict judicial scrutiny" because they may be abused by opposing counsel.[8] *Midwest Motor Sports v. Arctic Cat Sales, Inc*, 347 F.3d 693, 700-701 (8th Cir. 2003) (quoting *Hawker v. C.I.R.*, 82 F.3d 806, 808 (8th Cir. 1996)). The party asserting disqualification has the burden to demonstrate that the representation is impermissible, based upon the relevant professional rules and codes of conduct applicable in the jurisdiction. *Engineered Prods. Co. v. Donaldson Co., Inc.*, 290 F.Supp.2d 974, 980 (N.D. Ia. 2003). While disqualification is an extreme remedy which should be imposed only when absolutely necessary, *Macheca Transp. Co. v. Phila. Indem. Co.*, 463 F.3d 827, 833 (8th Cir. 2006), the Eighth Circuit has also held that all doubts should be resolved in favor of disqualification. *Coffelt v. Shell*, 577 F.2d 30, 32 (8th Cir. 1978); *see also Jo Ann Howard and Assoc., P.C. v. Cassity*, No. 4:09CV01252 ERW, 2012 WL 1247271, at *1 (E.D. Mo. April 13, 2012); *Engineered Prods.,* 290 F.Supp.2d at 980. In making this determination, the court should weigh whether disqualification would result in increased expenses, delay in resolution, and deprivation of choice of counsel against the nature and severity of the conflict and the duty of undivided loyalty existing in the specific case.

---

[8] Without conceding the issue, the United States Trustee presumes, for the purposes of this motion, that he is an opposing party.

*Kinzenbaw v. Case, LLC*, No. C 01-133 LRR, 2004 WL 1146462, at *4 (N.D. Ia. May 20, 2004).

50. The UST hereby incorporates and reasserts all of its above arguments concerning Mr. Garrison's conflicts under the Arkansas Rules of Professional Conduct. Even if the Court concludes that these are not direct conflicts in violation of the Rules of Professional Conduct, it should nevertheless disqualify Mr. Garrison because there is a substantial risk that Mr. Garrison will seek to advance the interests of FSF, which will impair the due administrative of justice. If Mr. Garrison and FSF wish to appear in this matter, they can file proper motions to intervene – but they cannot advance their interests as alleged counsel to one of the parties and be permitted to hijack these proceedings. To the extent that Mr. Soller is entitled to indemnification from FSF, that is a contractual matter between Mr. Soller and FSF. To require FSF to pay for conflict-free representation for Mr. Soller is no more than they already contractually obligated themselves to do.

51. Mr. Garrison's proposed application is akin to an insurance company seeking to defend its insured, not by hiring independent counsel with a duty of loyalty to the insured, but by hiring an officer of the insurance company. That cannot be permitted because such counsel cannot reasonably separate his own financial interests from the representation.

52. The MP and the UST Motion both involve whether Mr. Soller complied with this Court's rules, as well as the Bankruptcy Code and rules, in entering into certain fee agreements. FSF is not a party to these proceedings. However, FSF has effectively made itself a party by providing Mr. Garrison, one of its owner/directors, to represent Mr. Soller. FSF is akin to an amicus curiae, but one that has asserted the right to control a litigant's own defense. Mr. Garrison should not be allowed to do so, due to his clear and uncontested financial stake in the outcome of these issues. Mr. Garrison is an owner of FSF and clearly has a vested interest in FSF's continued operations.

53. On these facts, there is a substantial risk that Mr. Garrison's personal financial interests in FSF will impair his ability to represent Mr. Soller in the MP and the Eisenhart case because Mr. Garrison has a substantial interest in the outcome of the litigation. Mr. Garrison will be personally affected by the result of the litigation. Additionally, no competing considerations counsel against disqualifying Mr. Garrison. Disqualifying Mr. Garrison and providing Mr. Soller an opportunity to obtain disinterested counsel or, as many attorneys do, simply appear at the MP and UST Motion hearing to represent himself and explain his fees in these cases, will not delay the MP or the Eisenhart case. If Mr. Soller does wish to be represented, the costs involved in obtaining new counsel would presumably be borne by FSF under their indemnification and defense obligations, not by Mr. Soller. Thus, it is not a situation where denial of *pro hac vice* admission, or alternatively disqualification, will leave a needy party without representation. Accordingly, Mr. Garrison should be denied admission *pro hac vice* or be disqualified from representing Mr. Soller in these matters.

## V. CONCLUSION

WHEREFORE, the United States Trustee prays that this Court enter its Order denying the Motion to Appear *Pro Hac Vice*, or in the alternative disqualify Daniel E. Garrison from acting as counsel in this matter; and further prays for all other proper relief.

Respectfully submitted,

DANIEL J. CASAMATTA
ACTING UNITED STATES TRUSTEE

By: /s/ Kathryn M.C. Worlow
KATHRYN M.C. WORLOW, Bar No. 2018027
Trial Attorney
Office of the United States Trustee
200 West Capitol, Suite 1200
Little Rock, AR 72201-3618
(501) 324-7357
Kathryn.M.Worlow@usdoj.gov

Certificate of Service

The undersigned certifies that a copy of the foregoing was served by United States Mail, postage prepaid, this 10th day of September, 2021, upon those parties not receiving electronic notification.

JUSTIN EISENHART and BRITTANY EISENHART
315 TEXAS LANE, APT. 205
SPRINGDALE, AR 72764

ERIC SOLLER
SOLLER LAW FIRM
P.O. BOX 814
CHARLESTON, AR 72933

/s/ Kathryn M.C. Worlow
Kathryn M.C. Worlow